<p style="text-align:center; color:red;">CORRECTED</p>

# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
## No. 21-1132V

|  |  |
|---|---|
| DONALD HOLMBERG, | Chief Special Master Corcoran |
| Petitioner, | |
| v. | Filed: October 7, 2024 |
| SECRETARY OF HEALTH AND HUMAN SERVICES, | |
| Respondent. | |

*Alison Haskins, Siri & Glimstad, LLP, Aventura, FL,* for Petitioner.

*Benjamin Patrick Warder, U.S. Department of Justice, Washington, DC,* for Respondent.

### DECISION AWARDING DAMAGES[1]

On March 29, 2021, Donald Holmberg filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleged that following his receipt of an influenza ("flu") vaccine on January 28, 2020, he developed Guillain-Barré syndrome ("GBS"). Petition at ¶¶ 1, 24-25. The case was assigned to the Special Processing Unit ("SPU") of the Office of Special Masters. For the reasons set forth below, I find that Petitioner is entitled to $170,000.00 for past pain and suffering.

---

[1] Because this Decision contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

## I.    Relevant Procedural History

After the parties' initial settlement discussions hit an impasse, I entered Findings of Fact and Conclusions of Law in June 2023 that Petitioner had suffered the onset of GBS within 42 days of receipt of the flu vaccine. ECF No. 38.[3] On September 7, 2023, Respondent filed his Rule 4(c) Report confirming that he would not otherwise defend the case, ECF No. 41, and a Ruling on Entitlement for the Table flu/GBS claim was issued, ECF No. 42. The parties now request a determination of the appropriate award of damages. Petitioner's Motion for Findings of Fact and Conclusions of Law filed August 24, 2022 (ECF No. 29) ("Brief");[4] Respondent's Damages Response filed Nov. 3, 2023 (ECF No. 45) ("Response");[5] Petitioner's Damages Reply filed Nov. 15, 2023 (ECF No. 46) ("Reply"). The matter is ripe for adjudication.

## II.    Legal Standard

Compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." Section 15(a)(4). Additionally, a petitioner may recover "actual unreimbursable expenses incurred before the date of judgment award such expenses which (i) resulted from the vaccine-related injury for which petitioner seeks compensation, (ii) were incurred by or on behalf of the person who suffered such injury, and (iii) were for diagnosis, medical or other remedial care, rehabilitation . . . determined to be reasonably necessary." Section 15(a)(1)(B). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Hum. Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).

There is no mathematic formula for assigning a monetary value to a person's pain and suffering and emotional distress. *I.D. v. Sec'y of Health & Hum. Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) ("[a]wards for emotional

---

[3] *Holmberg v. Sec'y of Health & Hum. Servs.*, No. 21-1132V, 2023 WL 4742398 (Fed. Cl. Spec. Mstr. June 23, 2023).

[4] Petitioner filed his medical records filed as Exs. 1 – 26; sworn declarations from himself and other witnesses, Exs. 29 – 30, 39 – 40; documentation of expenses, Exs. 31 – 32; and medical literature regarding GBS, Exs. 33 – 38. He completed the last of these filings in October 2022. And as noted in the Findings of Fact, all declarations are signed under penalty of perjury consistent with 28 U.S.C.A. § 1746.

[5] Respondent initially opted to brief only the disputed onset issue and defer setting forth his respective position on the potential award of damages. *See* Respondent's Combined Report Pursuant to Vaccine Rule 4(c) and Response filed October 7, 2022 (ECF No. 32). After onset was resolved, Respondent duly briefed damages as noted above.

distress are inherently subjective and cannot be determined by using a mathematical formula"); *Stansfield v. Sec'y of Health & Hum. Servs.*, No. 93-0172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("the assessment of pain and suffering is inherently a subjective evaluation"). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering. *I.D.*, 2013 WL 2448125, at *9 (quoting *McAllister v. Sec'y of Health & Hum. Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

I may also consider prior pain and suffering awards to aid my resolution of the appropriate amount of compensation for pain and suffering in this case. *See, e.g.*, *Doe 34 v. Sec'y of Health & Hum. Servs.*, 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case."). And, of course, I may rely on my own experience (along with my predecessor Chief Special Masters) adjudicating similar claims.[6] *Hodges v. Sec'y of Health & Hum. Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress contemplated the special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims).

Although pain and suffering in the past was often determined based on a continuum, as Respondent argues, that practice was cast into doubt by the Court several years ago. *Graves v. Sec'y of Health & Hum. Servs.,* 109 Fed. Cl. 579 (Fed. Cl. 2013). The *Graves* court maintained that to do so resulted in "the forcing of all suffering awards into a global comparative scale in which the individual petitioner's suffering is compared to the most extreme cases and reduced accordingly." *Id.* at 590. Instead, *Graves* assessed pain and suffering by looking to the record evidence, prior pain and suffering awards within the Vaccine Program, and a survey of similar injury claims outside of the Vaccine Program. *Id.* at 595. Under this alternative approach, the statutory cap merely cuts off *higher* pain and suffering awards – it does not shrink the magnitude of *all* possible awards as falling within a spectrum that ends at the cap. Although *Graves* is not controlling of the outcome in this case, it provides reasoned guidance in calculating pain and suffering awards.

---

[6] From July 2014 until September 2015, the SPU was overseen by former Chief Special Master Vowell. For the next four years, until September 30, 2019, all SPU cases, including the majority of SIRVA claims, were assigned to former Chief Special Master Dorsey, now Special Master Dorsey. In early October 2019, the majority of SPU cases were reassigned to me as the current Chief Special Master.

### III.    Prior SPU Compensation of GBS Pain and Suffering[7]

#### A.    Data Regarding Compensation in SPU Flu/ GBS Cases

Flu/ GBS cases have an extensive history of informal resolution within the SPU. As of July 1, 2024, 840 SPU GBS cases have resolved since the inception of SPU ten years before. Compensation has been awarded in the vast majority of cases (799), with the remaining 41 cases dismissed.

The data for all categories of damages decisions described above reflect the expected differences in outcome, summarized as follows:

|  | Damages Decisions by Special Master | Proffered Damages | Stipulated Damages | Stipulated[8] Agreement |
|---|---|---|---|---|
| **Total Cases** | *49* | *376* | *17* | *357* |
| **Lowest** | $96.008.66 | $9,050.40 | $20,000.00 | $3,098.64 |
| **1st Quartile** | $158,520.99 | $127,216.71 | $155,000.00 | $100,000.00 |
| **Median** | **$170,903.68** | **$165,000.00** | **$252,000.00** | **$150,000.00** |
| **3rd Quartile** | $185,750.00 | $250,000.00 | $400,000.00 | $225,000.00 |
| **Largest** | $244,390.18 | $2,282,465.84 | $985,000.00 | $1,200,000.00 |

#### B.    Adjudication Specifically of GBS Pain and Suffering

Only a small minority of cases involved a special master's adjudication of damages issues. The written decisions setting forth such determinations, prepared by neutral judicial officers (the special masters themselves), provide the most reliable guidance in deciding what similarly situated claimants should also receive.[9]

---

[7] From July 2014 until September 2015, the SPU was overseen by former Chief Special Master Vowell. For the next four years, until September 30, 2019, all SPU cases, including the majority of SIRVA claims, were assigned to former Chief Special Master Dorsey, now Special Master Dorsey. In early October 2019, the majority of SPU cases were reassigned to me as the current Chief Special Master.

[8] One award was for an annuity only, the exact amount which was not determined at the time of judgment.

[9] Of course, even though *all* independently-settled damages issues (whether by stipulation/settlement or proffer) must still be approved by a special master, such determinations do not provide the same judicial guidance or insight obtained from a reasoned decision. But given the aggregate number of such cases, these determinations nevertheless "provide *some* evidence of the kinds of awards received overall in comparable cases." *Sakovits v. Sec'y of Health & Hum. Servs.*, No. 17-1028V, 2020 WL 3729420, at *4

As of July 1, 2024, in nearly every occasion that SPU has had to resolve the appropriate award for GBS pain and suffering, over $100,000.00 has been awarded. A lower sum of $92,500.00 was awarded just once. The remaining forty-eight (48) awards far exceeded $100,000.00. The first-quartile value is $155,00.00. The median is $165,000.00. The third-quartile value is $178,000.00. The largest award was $192,500.00.

These decisions are informed by information about GBS, including the description contained in the Vaccine Injury Table ("Table"). Pursuant to the Table, vaccine causation is presumed for GBS with an onset 3 – 42 days (not less than 3 days, and not more than 42 days) after receipt of a seasonal flu vaccine. 42 C.F.R. § 100.3(a)(XIV)(D). The Qualifications and Aids to Interpretation ("QAI") explain:

> GBS is an acute monophasic peripheral neuropathy that encompasses a spectrum of four clinicopathological subtypes… The interval between the first appearance of symptoms and the nadir of weakness is between 12 hours and 28 days. This is followed in all subtypes by a clinical plateau with stabilization at the nadir of symptoms, or subsequent improvement without significant relapse. Death may occur without a clinical plateau. Treatment-related fluctuations in all subtypes of GBS can occur within 9 weeks of GBS symptom onset, and recurrence of symptoms after this timeframe would not be consistent with GBS.

42 C.F.R. § 100.3(c)(15)(I) (2017). The three most common subtypes are acute inflammatory demyelinating polyneuropathy ("AIDP"); acute motor axonal neuropathy ("AMAN"); and acute motor and sensory neuropathy ("AMSAN"). Id. The onset of each is marked by "bilateral flaccid limb weakness and decreased or absent deep tendon reflexes in weak limbs." Id. at (c)(15)(II). The fourth subtype – Fisher syndrome or Miller-Fisher syndrome – has a different onset of "bilateral ophthalmoparesis; bilateral reduced or absent tendon reflexes; [and] ataxia." Id. at (c)(15)(III).[10]

---

(Fed. Cl. Spec. Mstr. June 4, 2020) (discussing the difference between cases in which damages are agreed upon by the parties and cases in which damages are determined by a special master).

[10] See also National Vaccine Injury Compensation Program: Revisions to the Vaccine Injury Table – Notice of Proposed Rulemaking, 80 Fed. Reg. 45132, at 45144 – 45 (July 29, 2015) (proposing addition of Table flu/GBS claims – explaining GBS is "an acute paralysis caused by dysfunction in the peripheral nervous system [that…] may manifest with weakness, abnormal sensations, and/or abnormality in the autonomic (involuntary) nervous system," and that death, when it occurs, is most often related to respiratory failure).

A consistent starting consideration is that "GBS pain and suffering awards generally should be higher than those awarded to petitioners who have suffered a less frightening and physically alarming injury, such as SIRVA."[11] *Gross v. Sec'y of Health & Hum. Servs.*, No. 19-0835V, 2021 WL 2666685, at *5 (Fed. Cl. Spec. Mstr. March 11, 2021); *see also, e.g.*, *Castellanos v. Sec'y of Health & Hum. Servs.*, No. 19-1710V, 2022 WL 1482497, at *10 (Fed. Cl. Spec. Mstr. Mar. 30, 2022) (emphasizing recognition of "the seriousness of GBS as a general matter," in awarding a six-figure sum); *Voeller v. Sec'y of Health & Hum. Servs.*, No. 20-1526V, 2023 WL 5019830, at *10 (Fed. Cl. Spec. Mstr. July 6, 2023) (noting GBS's "frightening" nature).

But of course, not every GBS case is equally severe. Further details of the initial medical course are considered – including any mistake or delay in diagnosing GBS; any in-patient hospitalization and/or in-patient rehabilitation (and the duration of any such stays); diagnostic procedures (e.g., bloodwork, lumbar punctures, electrodiagnostic studies, imaging); the severity of symptoms at their nadir (e.g., involving incontinence or respiratory failure); the extent and effectiveness of treatment (e.g., IVIg, plasmapheresis, pain medications); other interventions (e.g., feeding tubes, breathing tubes, catheterization); and any complications (e.g., sepsis during hospitalization).

Also relevant is the long-term course – as evidenced by out-patient therapies, neurology evaluations, and other medical appointments concerning GBS; the results of repeat electrodiagnostic studies and other relevant tests; medical providers' assessments of the degree of recovery achieved; ongoing reliance on assistive devices and medications; and relevant treatment gaps. Previous opinions have recognized that "a substantial recovery does not mean that [an individual] has fully recovered from his GBS and has no ongoing sequelae. It is common for petitioners to experience ongoing symptoms of GBS, such as numbness and fatigue, even with a good recovery." *Elenteny v. Sec'y of Health & Hum. Servs.*, No. 19-1972V, 2023 WL 2447498, at *5 (Fed. Cl. Spec. Mstr. Mar. 10, 2023). But symptoms of that nature are typically folded into a "typical" past pain and suffering award, and will not justify a future component. *See, e.g.*, *id.*; *Miller v. Sec'y of Health & Hum. Servs.*, No. 21-1559V, 2023 WL 2474322, at *8 (Fed. Cl. Spec. Mstr. Feb. 10, 2023).

"The mere fact that a claimant had pre-vaccination comorbidities does not *per se* diminish the impact of [the vaccine injury] on his life – especially one as alarming and potentially life-altering as GBS – and therefore is not alone reason for a lower award." *Bircheat v. Sec'y of Health & Hum. Servs.*, No. 19-1088V, 2021 WL 3026880, at *4 (Fed.

---

[11] Shoulder injury related to vaccine administration ("SIRVA") is another Table injury. 42 C.F.R. §§ 100.3(a), (c)(10).

Cl. Spec. Mstr. June 16, 2021). However, a special master is statutorily required to consider to what extent a petitioner's pain and suffering is truly "*from* the vaccine-related injury," Section 15(a)(4) (emphasis added), and not from any unrelated preexisting or subsequently-developed medical issues. *See, e.g.*, *Bircheat*, 2021 WL 3026880, at *4; *Gross*, 2021 WL 2666685, at *5.

Also worthy of consideration are the injury's impact on a petitioner's personal circumstances including his or her family and other personal obligations, and professional life (whether or not lost wages are directly claimed).

All of these facts are primarily gleaned from the medical records – although sworn statements and/or other evidence may also be considered, especially if they *supplement*, and do not contradict, the facts reflected in the medical records.

## IV.    Parties' Arguments

In seeking $180,000.00 for his past pain and suffering, Petitioner argues that his GBS onset, inpatient hospitalization, and rehabilitation stay were aggravated by his pre-existing post-traumatic stress disorder ("PTSD") and the emerging Pandemic. Brief at 13 – 15. After initial outpatient evaluations, he deferred further medical care in light of the risks posed by the Pandemic – but he "never did return to his baseline." *Id.* at 16. He argues that his ongoing numbness and tingling in his feet, and fatigue, have majorly disrupted his life, and are likely permanent. *Id.* at 28.[12] Petitioner therefore argues that his pain and suffering is equivalent to that demonstrated by the petitioners in *Johnson*, *Fedewa*, *Dillenbeck*, *Presley,* and *Devlin. Id.* at 18 – 23.[13]

---

[12] In support of this proposition, Petitioner filed several pieces of medical literature:

- Davidson, I., et al., *What Constitutes A 'Good' Recovery Outcome in Post-Acute Guillain-Barré syndrome? Results of a Nationwide Survey of Post-Acute GBS Sufferers in the United Kingdom*, 17 Eur. J. of Neurol. 677 (2009) [Ex. 33];
- Ex. 33 – Rudolph T., et al., *The Long-Term Functional Status of Patients with Guillain-Barré syndrome*, 15 Eur. J. of Neurol. 1332 (2008) [Ex. 34];
- Bernsen R., et al., *Long-Term Sensory Deficit After Guillain-Barré syndrome*, 248 J. Neurol. 483 (2001) [Ex. 35];
- De Vries, J., et al., *Fatigue in Neuromuscular Disorders: Focus on Guillain-Barré syndrome and Pompe Disease*, 67 Cell. And Mol. Life Sciences 701 (2010) [Ex. 36];
- Forsberg, A., et al., *Residual Disability 10 Years After Falling Ill in Guillain-Barré syndrome: A Prospective Follow-Up Study*, 317 J. Neuro. Sci. 74 (2012) [Ex. 37];
- Drory, V., et al., *Occurrence of Fatigue Over 20 Years After Recovery from Guillain-Barré syndrome*, 316 J. Neuro. Sci. 72 (2012) [Ex. 38].

[13] *Johnson v. Sec'y of Health & Hum. Servs.*, No. 16-1356V, 2018 WL 5024012 (Fed. Cl. Spec. Mstr. July 20, 2018); *Fedewa v. Sec'y of Health & Hum. Servs.*, No. 17-1808V, 202 WL1915138 (Fed. Cl. Spec. Mstr. March 26, 2020); *Dillenbeck v. Sec'y of Health & Hum. Servs.*, No. 17-428V, 2019 WL 4072069 (Fed. Cl.

In contrast, Respondent proffers that a lower award of $110,000.00 is appropriate, based on his view that Petitioner's GBS was limited in severity, featuring a "fairly swift" recovery to nearly his baseline of strength, and "no residual numbness and paresthesias." Response at 8. Respondent suggests that there is an eight-month gap of any GBS-related treatment (after initial presentation and treatment), which supports a conclusion that Petitioner's GBS residuals were "mild and tolerable." *Id.* Respondent also disputes that GBS explains Petitioner's reported ongoing fatigue; suggests that Petitioner may have suffered a "different persistent neuropathy"; and contends that at best, his compensable pain and suffering spans fifteen and one-half months. *Id.* at 8 – 9. Respondent suggests that Petitioner's pain and suffering is "somewhat" less severe than what was established in *Castellanos*,[14] and much less than in the cases cited by Petitioner. Response at 9 – 11. (Respondent does not address Petitioner's arguments in the Brief at 24 – 28 (discussing the medical literature cited at n. 13, *infra*).

Petitioner argues that the "treatment gap" was not as lengthy as Respondent contends and is adequately explained by his precautions during the Pandemic and his PTSD. He disputes that he suffered any unrelated neuropathy, and he maintains that his case is comparable to those cited in his opening Brief. *See generally* Reply.

## V.    Appropriate Compensation for Petitioner's Pain and Suffering

In this case, awareness of the injury is not disputed. The record reflects that at all times Petitioner was a competent adult with no impairments that would impact his awareness of his injury. Therefore, I analyze principally the severity and duration of Petitioner's injury.

In performing this analysis, I have reviewed the record as a whole, including the medical records, affidavits, and all assertions made by the parties in written documents. I considered prior awards for pain and suffering in both SPU and non-SPU GBS cases and rely upon my experience adjudicating these cases. However, I ultimately base my determination on the circumstances of this case.

---

Spec. Mstr. July 29, 2019); *Presley v. Sec'y of Health & Hum. Servs.*, No. 17-1888V, 20 WL 1898856 (Fed. Cl. Spec. Mstr. March 23, 2020); *Devlin v. Sec'y of Health & Hum. Servs.*, No. 19-0191V, 2020 WL 5512505 (Fed. Cl. Spec. Mstr. Aug. 7, 2020). Each case resulted in a $180,000.00 past pain and suffering award.

[14] *Castellanos v. Sec'y of Health & Hum. Servs.*, No. 19-1710V, 2022 WL 1482497 (Fed. Cl. Spec. Mstr. Mar. 30, 2022) (awarding $125,000.00 for past pain and suffering).

The evidence reflects that Mr. Holmberg – a 70-year-old, mostly retired, military veteran with chronic right hip pain, anxiety, and PTSD,[15] – received the subject flu vaccine on January 28, 2020. His initial bout with GBS was somewhat typical for that condition, based on my experience with these cases. Forty-two (42) days post-vaccination, on March 10, 2020, he developed numbness in his toes bilaterally, progressing to both feet, then balance issues,[16] prompting his emergency attention and admission to a local hospital on March 13, 2020. Ex. 2 at 64, 78, 92. He underwent imaging of his chest, lumbar spine, pelvis, and left femur. *Id.* at 84 – 90. An EKG revealed atrial fibrillation, and he received IV Cardizem and fluids. *Id.* at 90, 94 - 95. The first physical examinations suggested *normal* strength and deep tendon reflexes – but he reported hip pain of up to 8/10 with activity, felt unable to walk, and utilized a walker and a Hoyer lift. *Id.* at 63, 154, 163 – 67. He also experienced deficits with his upper extremities including decreased fine motor skills, causing difficulty using utensils and writing his name.

After his symptoms continued with no specific diagnosis, on March 17, 2020, Petitioner was transferred to St. Vincent's Hospital. There, he was documented to have decreased deep tendon reflexes, weakness, and decreased sensation in all extremities. Ex. 16 at 484, 505. On March 19, 2020, a lumbar puncture yielded cerebrospinal fluid with elevated protein – confirming the diagnosis of GBS. *Id.* at 493, 507, 594. He also received occupational therapy ("OT") and physical therapy ("PT"). Following a five-day course of IVIg, his strength improved, he could stand for a few seconds without support. *Id.* at 650. Thus, on March 24, 2020, Petitioner was moved to St. Vincent's inpatient rehabilitation facility, where he "had no worsening of neurologic status, but continued to make great gains from strength and sensation standpoint." Ex. 16 at 1305. On April 16, 2020, he was discharged from inpatient rehab with instructions for outpatient follow-up care, and to avoid driving until cleared by one of his physicians. *Id.*

The evidence reflects that during his initial course, Petitioner fortunately avoided the most severe possible manifestations of GBS – such as respiratory failure, incontinence, or severe neurological pain. Indeed, the only documented pain was in his right hip – which was noted to be chronic, and described as bursitis and/or osteoarthritis. *See, e.g.*, Ex. 2 at 8, 92; Ex. 3 at 10; Ex. 12 at 7. But his pain and suffering was enhanced by two unique facts. The first was his PTSD. He was repeatedly noted to be anxious, and assessed with an adjustment disorder during his hospitalization – although he did not receive any medications (beyond his preexisting prescription for Ativan) and he was

---

[15] *See, e.g.*, Ex. 4 at 105 (veterans' affairs counseling session, reflecting a specific fear of medical providers); Ex. 5 at 5 – 7 (primary care evaluation, in which Petitioner refused any physical examinations, labs, and diagnostic studies); Ex. 2 at 157 (reflecting prescription for Ativan 0.5 mg, which he took "at least daily").

[16] *Holmberg*, 2023 WL 4742398, at *5 – 6 (accepting the history in the neurology record found at Ex. 16 at 499).

assessed to be coping well, in counseling sessions. Ex. 16 at 1324 – 30. Second, his March 2020 GBS onset coincided with the emergence of the global Pandemic – which made his inpatient stay even more frightening, and isolating, due to the limit on in-person visits from loved ones.

However once discharged, Petitioner fortunately achieved a significant recovery from his GBS. He initially attended three skilled nursing evaluations, five PT sessions, and one OT session (all taking place at his home). Upon discharge at the end of April 2020, he had improved but persistent numbness and tingling in his feet, decreased/ absent reflexes in his legs, impaired gait, and fatigue. He was using a walker less. He had achieved all goals, and demonstrated adherence to a home exercise program, which was focused on further improving his strength and balance. *See generally* Ex. 3.

By his June 10, 2020, outpatient neurology evaluation, Petitioner was not using a walker or any other assistive device. Ex. 11 at 5. An exam documented normal muscle tone and strength; slight weakness of the right leg; absent/ decreased lower extremity reflexes; and gait abnormalities. *Id.* at 6 – 7. The neurologist assessed that Petitioner was "almost back to his baseline strength level and is only having very mild levels of fatigue and some right lower extremity weakness," for which he should continue daily home exercises. *Id.* at 7. I do recognize, however, that two weeks later, Petitioner's wife reported that he seemed weak, short-tempered, and "not as quick as he was," *Id.* at 9.

The neurologist recommended a primary care consultation, which took place on August 26, 2020, and over the telephone in light of the Pandemic. Ex. 10 at 11. Petitioner reported: "[w]alk[ing daily before going to work. Neurologist says it can take months to get over [GBS]. States that he still can tell the difference. States that he was also told immune system was low – so stays away from people. Agrees to come in in 6 mo[nths] to get labs and be seen." Ex. 10 at 11. The primary care provider recorded: "Recommended not to get vaccinations for a few months." *Id.* at 17. Based on this his medical record (supplemented by the later records and affidavits), I accept that Petitioner's precautions against contracting COVID help to explain the gap in medical *documentation* of his GBS residual symptoms. But he has not identified any particular *treatments* that he might have obtained but for the Pandemic. Thus, the treatment gap does not particularly favor either party's damages position.

Over five months after the primary care call, on February 8, 2021, Petitioner was reevaluated by a neurologist. Ex. 11 at 11. The exam found absent/ decreased lower extremity reflexes and gait abnormalities, plus an additional observation of "slightly

diminished vibratory sensation in toes."[17] *Id.* at 12. The neurologist assessed that Petitioner had "recovered quite well" from GBS, but his reported inability to return to his previous level of functioning may be a" residual effect" of that disease. *Id.* The neurologist doubted that Petitioner's reported daytime fatigue and drowsiness was due to GBS. *Id.* However, this complaint seems consistent or possibly secondary to his other symptoms. It is also frequently recognized in past OSM cases and in medical literature, such as the articles filed by Petitioner here. Accordingly, I accept that Petitioner's fatigue was at least partially explained by his GBS – although isolation during the Pandemic, and natural aging, may also have been contributory.

Upon the neurologist's referral, between February 24 – April 23, 2021, Petitioner attended 17 PT sessions. *See generally* Ex. 12, 18, 20 – 21. He was again assessed with weakness, fatigue, and abnormal gait – putting him at risk for potential falls. Ex. 12 at 8. But with PT, he improved his gross strength and mobility. Ex. 21 at 3. He denied having any particular functional deficits or activities of daily living, and he was again discharged with a home exercise program. *Id.*

The neurologist also sought electromyography ("EMG") and nerve conduction velocity ("NCV") studies "to see if [Petitioner] had a good recovery of the peripheral neuropathy [GBS] and does not have a mild peripheral neuropathy that may be suggestive of a chronic problem such as CIDP."[18] Ex. 11 at 12. An EMG could not be obtained because some other, unspecified physician "would not allow him to hold his Eliquis" [an anticoagulant medication]. Ex. 17 at 11.

But on April 28, 2021, the neurologist conducted an NCV of Petitioner's lower extremities, which found evidence of a "moderate to severe axonal and demyelinating sensory motor peripheral neuropathy." Ex. 17 at 11. The neurologist found it "difficult" to make a definitive diagnosis because Petitioner had not undergone electrodiagnostic studies during his initial hospitalization for GBS. *Id.* Two weeks later, the neurologist's assessment was "idiopathic peripheral neuropathy, and he was still awaiting the results of lab testing for any "treatable causes of peripheral neuropathy." Ex. 26 at 6. There are no further neurology records. I conclude that overall, there is not preponderant evidence

---

[17] Decreased sensation in Petitioner's feet may not have been recognized (or evaluated) at the June 2020 outpatient neurology appointment, but that finding is consistent with earlier records.

[18] Chronic immune demyelinating polyneuropathy ("CIDP"), if ultimately diagnosed, is among the exclusionary criteria that defeat a Table flu/GBS claim. 42 C.F.R. § 100.3(c)(15)(vi).

that Petitioner developed CIDP or any unrelated peripheral neuropathy, but only GBS with nerve damage and symptoms persisting over 13 months into the course.[19]

Overall, the evidence best supports the conclusion that despite Petitioner's initial GBS pain and suffering being moderately severe (particularly due to his PTSD and the Pandemic), he had significantly recovered and was walking independently within two months. He had residual effects of numbness/ tingling in his feet, abnormal gait, poor balance, deconditioning, and fatigue that was documented up to 13 months post-vaccination. It is more likely than not that those symptoms would have persisted for at least another year, based on the NCV findings, Ex. 17 at 11, and the attestations of Petitioner, his wife, his son, and a neighbor (completed in mid-late 2022). *See generally* Ex. 29 - 30, 39 – 40.

Petitioner and the supporting witnesses describe that as a result of his GBS, he has stopped working part-time at a golf course during the summer months. He has also stopped hunting; goes on shorter walks; and is more dependent on his wife, children, and grandchildren. *See, e.g.*, Ex. 40 at ¶ 16; Ex. 39 at ¶ 10. These descriptions do not contradict the medical records and are sufficiently persuasive to be accepted. I recognize that the activities he has lost were meaningful, but they are nevertheless quantitatively different than a full-time profession or caring for dependent family members.

Respondent's citation to *Castellanos* (awarding $125,000.00) is easily distinguishable because in that case, the medical providers deemed specific comorbidities – including diabetic peripheral angiopathy and carpal tunnel syndrome – to be more clinically significant in assessing his long-term condition. *Castellanos*, 2022 WL 1482497, at *10 – 11.

More apt is Petitioner's citation to *Devlin* (awarding $180,000.00) – also involving a largely healthy, retired older individual, with documented anxiety surrounding his GBS onset and prognosis. *Devlin,* 2020 WL 5512505, at *3. The *Devlin* petitioner was nonetheless properly diagnosed and treated for GBS during his initial hospitalization but was documented to have residual symptoms such as "tingling in his feet and toes" for about one year. *Id.* at *3 and n. 12. But I am also informed by more recent cases. For instance, *Wilson*[20] involved respiratory decline and intubation, complications like bed sores and shingles, a longer hospital stay, and a higher number of PT sessions. But the

---

[19] I have also reviewed additional records that reflect that as of August 2021, Petitioner had been walking 1 – 2 miles daily, but injured his knee tripping over a dog leash. No provider endorsed this injury as a sequela of GBS. *See generally* Exs. 21, 24; Ex. 25 at 5 – 8.

[20] *Wilson v. Sec'y of Health & Hum. Servs.*, No. 20-588V, 2021 WL 5143925 (Fed. Cl. Spec. Mstr. Oct. 5, 2021) (awarding $175,000.00 for past pain and suffering).

petitioner's overall recovery in the most important areas of function and mobility was good, notwithstanding some residual effects and disruptions to leisure pursuits. *Wilson*, 2021 WL 5143925, at *4 – 5. And *Schenck*[21] involved a "mild GBS illness which had resolved, except for some residual tingling in his feet within less than two months" – but enhanced suffering in light of the petitioner's wife's recovery from recent brain surgery; his mother's passing; and the Pandemic's ongoing impact around his GBS onset in late 2020. *Schenck*, 2023 WL 2534594, at *3 – 4.

**Overall based on past experience and my review of this particular case's evidence, I find it fair and appropriate to award Mr. Holmberg $170,000.00 for his past pain and suffering.**

### Conclusion

Based on the record as a whole and arguments of the parties, **I award Petitioner a lump sum payment of $170,915.57 (representing $170,000.00 for past pain and suffering, [22] and $915.57 for past unreimbursable expenses[23]) in the form of a check payable to Petitioner.** This amount represents compensation for all damages that would be available under Section 15(a).

The Clerk of Court is directed to enter judgment in accordance with this decision.[24]

**IT IS SO ORDERED.**

<div align="right">

**s/Brian H. Corcoran**
Brian H. Corcoran
Chief Special Master

</div>

---

[21] *Schenck v. Sec'y of Health & Hum. Servs.*, No. 21-1768V, 2023 WL 2534594 (Fed. Cl. Spec. Mstr. Feb. 10, 2023) ($150,000.00).

[22] Since this amount is being awarded for actual, rather than projected, pain and suffering, no reduction to net present value is required. *See* Section 15(f)(4)(A); *Childers v. Sec'y of Health & Hum. Servs.*, No. 96-0194V, 1999 WL 159844, at *1 (Fed. Cl. Spec. Mstr. Mar. 5, 1999) (citing *Youngblood v. Sec'y of Health & Hum. Servs.*, 32 F.3d 552 (Fed. Cir. 1994)).

[23] Petitioner initially requested $1,222.72. Brief at 13, *see also* Exs. 31 – 32 (supporting documentation). Respondent supported the majority of expenses but opposed $307.15 spent on hotel accommodations. Response at 12; *see also* Ex. 31 at 1, 11. I agree that this expense is not compensable, as it was not incurred "by or on behalf of Petitioner," who was inpatient at the time, and could not have utilized the hotel room. It seems more likely that family members were staying there to be closer to him. *See* Vaccine Act Section 15(a)(1)(B). Petitioner did not further defend this cost in his Reply. Therefore, Petitioner will be awarded $915.57 in reimbursement of past medical expenses.

[24] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.